CLIFFORD CHANCE US LLP
Jennifer C. DeMarco
Sarah N. Campbell
31 West 52nd Street
New York, New York 10019
Telephone: (212) 878-3427

*Attorneys for the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                          :
In re                                     :
                                          :   Chapter 15
Supercanal S.A.,¹                         :
                                          :   Case No. [_____]
Debtor in a Foreign Proceeding.           :
                                          :
                                          :
-------------------------------------------------------------x
```

**DECLARATION OF EDUARDO MARCELO VILA IN SUPPORT OF (I) VERIFIED**
**CHAPTER 15 PETITION, (II) FOREIGN REPRESENTATIVE'S MOTION FOR**
**ORDER GRANTING FINAL RELIEF IN AID OF A POREIGN PROCEEDING, AND**
**(III) CERTAIN RELATED RELIEF**

Eduardo Marcelo Vila, a citizen of the Republic of Argentina ("**Argentina**"), hereby

declares under penalty of perjury under the laws of the United States of America, as follows:

1.      I am the authorized foreign representative (the "**Foreign Representative**") for

Supercanal S.A. ("**Supercanal**"), the above-captioned debtor (the "**Debtor**") in Supercanal's

restructuring pursuant to a *Concurso Preventivo* ("**Concurso**") under the provisions of Title II,

Chapters I through VI of the Argentine Reorganizations and Bankruptcy Law No. 24,522 (as

---

¹ The last four digits of the taxpayer registration number of the Debtor are 252-6.  The Debtor's executive headquarters is located at Lisandro de la Torre 150, Mendoza (5500) Mendoza, Argentina.

amended) (the "**Argentine Insolvency Law**") before the National First Instance Commercial

Court No. 20 (*Juzgado Nacional de Primera Instancia en lo Comercial No. 20*), Clerks Office

No. 40 (*Secretaría No. 40*), sitting in the City of Buenos Aires, Argentina (the "**Argentine**

**Court**" and, such proceeding, the "**Foreign Proceeding**"). I am fully authorized to act on behalf

of the Debtor with respect to the Foreign Proceeding.

2.      I submit this declaration in support of the (a) Petition for Recognition of Foreign

Main Proceeding; and (b) Motion for (i) Recognition of Foreign Main Proceeding; (ii)

Enforcement of the Endorsed Reorganization Plan; and (iii) Certain Related Relief. I am an

individual over the age of 18 and, if I am called upon to testify, I will testify competently to the

facts sets forth herein.

3.      In my role as Director of Legal Affairs (*Director de Asuntos Legales*) of the

Debtor, agent appointed under the Supercanal Reorganization Plan (as defined below), and

attorney-in-fact of the Debtor, I have become familiar with the history, day-to-day operations,

assets, financial condition, business affairs, and books and records of the Debtor.  Except as

otherwise indicated, all facts set forth in this Declaration are based upon: (a) my personal

knowledge; (b) my review of relevant documents; (c) information supplied to me by other

employees, affiliates, officers, or directors of the Debtor, or by professionals retained by me or

the Debtor, including, with respect to matters of United States bankruptcy law, information

provided to me by United States counsel, Clifford Chance US LLP ("**CC**") and, with respect to

matters of Argentine bankruptcy law, information provided to me by Argentine counsel, Naveira,

Truffat, Martínez, Anido, Lorente & López Abogados ("**NTMDALL**"); or (d) my opinion based

upon my experience and knowledge of the Debtor's operations and financial condition.

**Background**

A.    **The Debtor's Business**

4.    The Debtor is a corporation (*sociedad anónima*) organized, existing and operating under the laws of Argentina.  The Debtor is the holder of a Unique Argentine Digital License (*Licencia Única Argentina Digital*), for the provision of cable TV and internet services in the whole territory of Argentina and its business consists primarily of the installation, operation and development of cable television and data cable transmission.  The Debtor conducts all its operations in Argentina.  It is one of the major providers of television and broadband services in terms of subscribers with approximately 5% and 1% market share in television and fixed broadband services in Argentina, respectively; and approximately 37.1% and 7.5% market share in television and fixed broadband services, respectively, in the Argentine provinces where it provide coverage.  In addition, it is one of the largest multi-system operators (MSO) in Argentina in terms of subscribers and is the only provider of internet and television services in many remote areas of Argentina.  A MSO is a company that owns multiple cable systems in different locations under the control and management of a single, common organization.

5.    The Debtor operates in large parts of the Argentine territory and its coverage reaches 14 out of the 24 Argentine provinces.  Its geographical scope is divided into three main regions: the *Región Norte*, or "Northern Region" (which includes the provinces of La Rioja, Catamarca, Tucumán, Santa Fe and Santiago del Estero); the *Región Centro*, or "Central Region" (which includes the provinces of San Juan, Mendoza, San Luis and Córdoba); and the *Región Sur*, or "Southern Region" (which includes the provinces of Neuquén, Río Negro, Chubut, Santa Cruz and Tierra del Fuego).

6.      The Debtor's center of main interest is located in Argentina.  It is operationally and functionally centered in the City of Mendoza, where its senior management and its combined cash management and accounting functions are located.  Indeed, among other connections to Argentina:

(a)      The Debtor's registered office is at Hipólito Bouchard 680, 5th Floor, City of Buenos Aires, Argentina;

(b)      the Debtor's main assets are its properties, business and interests in its subsidiaries in Argentina;

(c)      all of Debtor's operations are conducted, managed and directed from the City of Mendoza, Province of Mendoza, Argentina;

(d)      corporate governance for the Debtor is directed from the City of Buenos Aires, Argentina;

(e)      in-person meetings of the Debtor's Board of Directors and shareholders are held in the City of Buenos Aires, Argentina;

(f)      all members of the Debtor's Board of Directors hold their domicile in Argentina;

(g)      the Debtor's corporate accounting, accounts payable, insurance procurement, accounts receivable, financial planning, internal auditing, marketing, treasury, regulatory, research and development, and tax services are provided from the City of Mendoza, Argentina;

(h)      the Debtor's finance, legal, human resources, payroll, billing, and other services are carried out in the City of Mendoza, Argentina;

(i)      the Debtor's cash management functions are maintained and directed from the City of Mendoza, Argentina;

(j)      key information technology and systems used by the Debtor are provided from the
City of Mendoza, Mendoza, Argentina;

(k)      management and senior staff of the Debtor regularly attend meetings in the City of
Mendoza, Mendoza, Argentina and Buenos Aires, Argentina; and

(l)      the chief executive office of the Debtor is based in the City of Mendoza,
Mendoza, Argentina.

**B.      The Debtor's Connection with the United States**

7.      Substantially all of the assets of the Debtor are located in Argentina.  However,
the Debtor currently maintains assets in the United States consisting of an interest in an undrawn
cash retainer deposited with CC, the Debtor's and the Foreign Representative's United States
counsel in connection with this Chapter 15 case.  This retainer was deposited by the Debtor and
is being held by CC in a client trust account with The Citibank Private Bank in New York (the
"**Client Trust Account**"). To the extent that such funds are not ultimately applied to fees
charged and expenses incurred by CC in connection with the administration of this Chapter 15
case, the Debtor have the right to the return of its funds held in the Client Trust Account.

8.      In addition, the Debtor is party, as issuer, to a certain indenture dated as of May
13, 1998 (the "**Indenture**"), by and among Supercanal Holding S.A. and Supercanal S.A., as
issuers, and The Bank of New York Mellon (as successor in interest to The Bank of New York),
as Trustee, Registrar and Paying Agent (the "**Trustee**").  The Indenture governs the
$300,000,000 11.50% Senior Notes Due May 15, 2005 (CUSIPS 867956AA20 and
P8801KAA09) (the "**Unsecured Notes**", and the holders thereof, the "**Holders**"), which are
subject to the restructuring under the Supercanal Reorganization Plan (as defined below) in the
Concurso.  Under the terms of the Indenture, the Unsecured Notes are governed by New York

5

law.  Pursuant to Section 12.8 of the Indenture, "*The Indenture and the Notes will be governed by and construed in accordance with the law of the State of New York without giving effect to applicable principles of conflicts of law to the extent that the application of the law of another jurisdiction would be required thereby*", and pursuant to Section 12.9, the Debtor submitted to the non-exclusive jurisdiction of any court of the State of New York or any United States federal court sitting in the Borough of Manhattan, The City of New York, New York, United States. Therefore, it is my understanding that the Debtor also has significant intangible property interests in the form of contractual rights under the Indenture that are located, for legal purposes, in New York.

9.      The foregoing are the only significant assets of the Debtor in the United States. Accordingly, New York, New York, is the jurisdiction where the Debtor's principal assets in the United States are located.

10.     In an effort to restructure its unsecured indebtedness after the Argentine economic crisis in 2001, the Debtor took the steps to accomplish a restructuring under the Argentine Insolvency Law.  The commencement of the Foreign Proceeding and this Chapter 15 case represents a critical step in the Debtor's efforts to restructure for the benefit of its unsecured creditors, including the Holders.

**C.      Corporate and Capital Structure**

11.     As described above, the Debtor is an operative company, which also holds participations in Argentine subsidiaries.  Attached as <u>Exhibit A,</u> is a chart of the Debtor's corporate structure.

12.     As of the Petition Date (as defined below), the outstanding principal amount of the Unsecured Notes was $300,000,000.  The Unsecured Notes bear interest at a rate of 11.50%.

6

The Unsecured Notes have been issued in the form of a Restricted Global Note under Rule 144A of the United States Securities Act of 1933 ("**Rule 144A**"), as amended (the "**Securities Act**") and a Regulation S Note under the Regulation S under the Securities Act ("**Regulation S**"), which have been registered in the name of Cede & Co. as nominee of the Depositary Trust Company ("**DTC**"), which serves as central depositary, and are deposited with the Trustee. The Unsecured Notes are not registered under the Securities Act. Instead they were offered and sold (a) in offshore transactions in reliance on Regulation S, and (b) to Qualified Institutional Buyers in reliance on Rule 144A.

13.    Other than the Unsecured Notes, the Debtor's most significant debt obligations as of the Petition Date consisted of $104,328,326 in principal amount of Senior Floating Rate Notes Due 2002 (the "**Secured Notes**") issued under a certain Amended and Restated Note Purchase Agreement among Supercanal Holding S.A. and various subsidiaries that are or may become party thereto, as issuers and various financial institutions, as purchasers, ING Baring (US) Securities, Inc., as arranger, ING Baring (US) Capital Corporation, as administrative and collateral agent, and The Bank of New York, as registrar, as amended by the First Amendment to the Amended and Restated Note Purchase Agreement dated as of June 2, 1998.

14.    According to the report of the receivers in the Foreign Proceeding, as described in the First Endorsement, the aggregate amount of the unsecured claims verified and admitted (the "**Unsecured Claims**", and the holders thereof, the "**Unsecured Creditors**"), to be computed for purposes of the calculation of the Requisite Majorities (as defined below) for consenting to the Supercanal Reorganization Plan (as defined below) amounted to a total of 190 Unsecured Creditors and an aggregate of AR$/$411,641,115.82[2] (including US$355,501,666.67 in principal

---

[2] Since 1992, and until repeal of the Convertibility Law (as defined below) in January 2002, the exchange rate between United States Dollars and Argentine Pesos was AR$1 = USD1.

amount and accrued and unpaid interests on the Unsecured Notes as of the Petition Date (as defined below)).

15.    As of December 31, 2011, immediately prior to the implementation of the Capitalizations (as defined below), the aggregate amount of the Unsecured Claims amounted to AR$1,687,664,431.41[3] (including AR$1,528,657,166.68 in principal amount and accrued and unpaid interests on the Unsecured Notes as of the Petition Date); the aggregate amount of the Secured Notes amounted to AR$467,483,211 (including principal and accrued and unpaid interests as of such date); and the aggregate amount of all reported assets of the Debtor amounted to AR$1,590,627,577.

**D.    Prior Restructuring Actions and Events Leading to the Filing of the Foreign Proceeding and this Chapter 15 Case.**

16.    After the hyperinflation in the late '80s, in 1992 the Argentine Congress passed the Law No. 23,928, which pegged the Argentine Peso to the United States Dollars (the "**Convertibility Law**").  During the years following the adoption of the Convertibility Law, there was a large amount of foreign investment in Argentina, including through corporate debt in the form of debt securities placed in the international markets similar to the Unsecured Notes. Within its expansion plans, the Debtor issued the Unsecured Notes and the Secured Notes during this period, in 1998.

17.    By early 2000s, recession, inflation, appreciation of the Argentine Peso against the United States Dollars, loss of the Argentine economy's international competitiveness, reduction of Federal reserves and flow of funds out of Argentina, provoked the largest economic

---

[3] For which purpose, all Unsecured Claims denominated in United States Dollars with foreign Unsecured Creditors were converted into Argentine Pesos at the Applicable Exchange Rate (as defined below).

crisis in Argentine recent history.  The Company defaulted in the payment of its Unsecured

Notes in 2000 and filed the petition for the Foreign Proceeding in March that year.

18.    As a consequence of the economic crisis, in early 2002 the Argentine Congress

terminated the peg of the Argentine Peso with the United States Dollars and let the United States

Dollars exchange rate to float.  The effect of this measure was an initial sharp and abrupt

depreciation of the Argentine Peso for more than three times (which continued to depreciate

considerably since then).  Accordingly, many companies, like the Debtor, that at that time were

highly indebted in United States Dollars, and which only or main source of income was

Argentine Pesos, faced an immediate impossibility to perform the payments under their current

liabilities.  All these circumstances led to the period of the largest volume (in amount and

number) of cross-border corporate restructurings in Argentine history.

**E.    The Foreign Proceedings and the Supercanal Reorganization Plan**

19.    On March 29, 2000 (the "**Petition Date**"), the Debtor, and the following members

of the Supercanal group (the "**Joint Debtors**") Supercanal Holding S.A., DTH S.A., Argentina

Televisora Satelital S.R.L., SMR S.A., Nueva Visión Satelital S.R.L., Televisora del Oeste S.A.,

Supercanal Internacional S.A., Pehuenche Cable Televisora Color S.R.L., Sucanal S.R.L.,

Cablemax S.A., Aguilares Cablevisión S.R.L., Cabletelevisora Color S.R.L., Inversora Antena

Comunitaria Trelew S.A., Atelco S.A., Monteros Televisora Color S.R.L., Comunicaciones

Austral S.A., AR TV S.A., Antena Televisora Comunitaria S.A., Horizonte S.R.L., San Martín

de los Andes Televisora Color S.A., Cabledifusión S.A., Transcable S.A., Aconquija Televisora

Satelital S.R.L., Televisora Austral S.A., Cabletelevisora Color Mercedes S.R.L., Mirror Holding

S.R.L., Inversora Atelco Comodoro S.A. and MSO Supercanal S.A. filed a petition for a

substantive consolidated reorganization proceeding (*concurso por agrupamiento*) before the Argentine Court.

20.     The Argentine Court admitted the petition and ordered the commencement of the Foreign Proceeding on April 19, 2000.  Pursuant to the Argentine Insolvency Law, notice of the Argentine Court admission order was published by the Debtor for five days in the Official Gazette and other newspapers of wide distribution designated by the Argentine Court at the domicile of the Debtor and at the other jurisdictions where the Joint Debtors had business.  In addition, notice of the admission order was given by the receiver to the unsecured creditors through registered letter to each Unsecured Creditor denounced by the Joint Debtors at the petition for the commencement of the Foreign Proceeding.

21.     On November 4, 2005, the Joint Debtors filed the proposed reorganization plan before the Argentine Court addressed to a single category including all Unsecured Claims, which main terms are described below (the "**Supercanal Reorganization Plan**"):

(a)     The completion of the merger by the Debtor of each of SMR S.A., Sucanal S.R.L., Cablemax S.A., Inversora Antena Comunitaria Trelew S.A., Atelco S.A., Monteros Televisora Color S.R.L., AR TV S.A., Antena Televisora Comunitaria S.A., Horizonte S.R.L., San Martín de los Andes Televisora Color S.A., Cabledifusión S.A., Transcable S.A., Televisora Austral S.A., Cabletelevisora Color Mercedes S.R.L., and Inversora Atelco Comodoro S.A., which was effective as of January 1st, 2000.

(b)     The merger by the Debtor of each of Supercanal Holding S.A., Nueva Visión Satelital S.R.L., Televisora del Oeste S.A., Supercanal Internacional S.A., Comunicaciones Austral S.A., Aconquija Televisora Satelital S.R.L., Mirror Holding S.R.L. and MSO Supercanal S.A. (the "**Second Merger**").

(c)    A reduction of 16% (the "**Reduction**") of the Unsecured Claims, and the resulting amount, the "**Reduced Unsecured Claims**").

(d)    A cash payment of $20,000,000 to be made by the Debtor to the SPV (as defined below) and to be deducted from the Reduced Unsecured Claims (the "**Cash Payment**", and the Reduced Unsecured Claims after such deduction, the "**Convertible Unsecured Claims**").

(e)    (i) The capitalization of (1) 94% of the Convertible Unsecured Claims in the Debtor (the "**SCSA Capitalization**"), (2) 4% of the Convertible Unsecured Claims in Tele Imágen Codificada S.A. (the "**TIC Capitalization**"), and (3) 3% of the Convertible Unsecured Claims in BTC S.A. (the "**BTC Capitalization**"); in all cases through the issuance and delivery of new shares of each such companies distributed as follows: (x) 30% ordinary, nominative non-endorsable shares of AR$1 nominal value per share and 5 votes each, and (y) 70% ordinary, nominative non-endorsable shares of AR$1 nominal value per share and 1 vote each; and (ii) the capitalization of the shares resulting from the capitalizations described in (i) in a special purpose vehicle to be incorporated pursuant to the Supercanal Reorganization Plan (the "**SPV**") against the issuance by the SPV of: (1) 85% of new shares comprised of: (x) 30% new ordinary, nominative non-endorsable shares of AR$1 nominal value per share and 5 votes each, denominated Class A1 (the "**Class A1 Shares**"); and (y) 70% new ordinary, nominative non-endorsable shares of AR$1 nominal value per share and 1 vote each, denominated Class A2 (the "**Class A2 Shares**", and together with the Class A1 Shares, the "**Class A Shares**"); to be distributed to the holders of the Convertible Unsecured Claims; and (2) 15% of new shares comprised of: (x) 30% new ordinary, nominative non-endorsable shares of AR$1 nominal value per share and 5 votes each, denominated Class B1 (the "**Class B1 Shares**") and (y) 70% new

ordinary, nominative non-endorsable shares of AR$1 nominal value per share and 1 vote each, denominated Class B2 (the "**Class B2 Shares**", and together with the Class B1 Shares, the "**Class B Shares**"); to be distributed to the promoters under the Supercanal Reorganization Plan (the "**SPV Capitalization**", and together with the SCA Capitalization, the TIC Capitalization and the BTC Capitalization, the "**Capitalizations**").

(f)       For purposes of the capitalization of the Convertible Unsecured Claims, the Unsecured Claims denominated in foreign currency are converted into Argentine Pesos at the average of the buy and sell foreign exchange for United States Dollars published by the Banco de la Nación Argentina on the date on which the endorsement of the Supercanal Reorganization Plan becomes final and non-appealable.

(g)       Mr. Carlos Esteban Cvitanich and I have been appointed as agents for the creation of the SPV, the implementation of the Capitalizations, and the delivery of the Class A Shares and the Class B Shares pursuant to the Supercanal Reorganization Plan (the "**Agents**").

22.       The requisite majorities for the approval by the creditors and endorsement by the Court of a reorganization plan in a Concurso amounts to (the "**Requisite Majorities**"): (i) the absolute majority of creditors (on a headcount basis) (the "**Headcount Majority**"), within each category; and (ii) representing two thirds of the computable principal amount (the "**Principal Majority**")[4].

23.       §45bis of the Argentine Insolvency Law, which provides for the consent to a reorganization plan by the holders of securities issued in series (like the Unsecured Notes) at a

---

[4] Pursuant to §45 of the Argentine Insolvency Law, "*[i]n order to obtain the approval of the proposal of composition, the debtor must file before the court, until the day of expiration of the period of exclusivity, the text of the proposal, including the consent thereto, evidenced by a written statement, with the signature certified by a Notary Public, or a legal or administrative authority in the case of national, provincial, municipal public authorities, from the absolute majority of creditors, within all and each of the categories, representing two thirds of the computable capital within each category. Only those consents which are dated prior to the last proposal or amendment thereto submitted by the debtor in the record, shall be declared valid and computable.*"

meeting of holders of those securities was introduced in the Argentine Insolvency Law after the

Petition Date, on May 15, 2002.  Pursuant to §45bis of the Argentine Insolvency Law, as

amended by Law No. 25,589 on May 15, 2002:

> "*The holders of debentures, convertible bonds, negotiable obligations or other*
>
> *securities issued in series representing claims against the debtor, shall take part to*
>
> *obtain conformities as per the following system:*
>
> 1) *They shall hold a meeting convened by the trustee or by the judge, as the case*
>    *may be.*
>
> 2) *At the meeting, participants shall express their conformity or rejection to the*
>    *relevant plan of reorganization; and shall state which alternative they adhere to*
>    *in the event the plan is approved.*
>
> 3) *Conformity shall be computed by the capital represented by all those who have*
>    *accepted the plan, and as if same were granted by a single person; rejections*
>    *shall also be computed as granted by a single person.*
>
> 4) *Conformity shall be stated by the trustee or by that who was appointed by the*
>    *meeting, serving the minutes of the meeting as a sufficient instrument for all*
>    *effects.*
>
> 5) *The meeting may be omitted when the trust or rules applicable thereto provide*
>    *another method to obtain acceptance from the securities holders deemed*
>    *sufficient by judge.*
>
> 6) *In the event in which the trustee has been deemed allowed or declared*
>    *admissible as claim holder, pursuant to section 32 bis, it may split his vote;*
>    *acceptance shall be computed for the capital of beneficiaries who have*

*expressed conformity with the plan of reorganization as per the method set forth*

*in the trust or in the law applicable thereto; and the rest, shall be computed as*

*rejection. It shall be computed in the majority of persons as an acceptance and a*

*rejection.*

7) *In case of those authorized or of representatives of groups allowed or declared*

   *admissible within the terms of Section 32 bis, Subsection 6), shall be applied in*

   *the voting system.*

8) *In all cases the judge may instruct the relevant measures to ensure the*

   *participation of creditors and the regularity to obtain conformities or*

   *rejections.*"

24.      The Argentine courts have construed the manner in which the consents of the

holders of the debt securities at such meeting must be computed for purposes of the calculation

of the Requisite Majorities.  According to the prevailing court's construction of §45bis of the

Argentine Insolvency Law[5], (i) for purposes of the Headcount Majority, all holders of the debt

securities participating at the meeting and voting in favor of the reorganization plan will be

computed as a single creditor, and all holders participating at the meeting and voting against the

plan will be computed as a single creditor, regardless of the actual number of holders that

actually voted in favor or against the reorganization plan; and (ii) for purposes of the Principal

Majority, the principal amount corresponding to the debt securities held by those holders that did

not participate at the meeting, or that having participated at the meeting abstained from voting,

are deducted from the aggregate amount of the computed unsecured claims.

---

[5] Pursuant to the following resolutions of the competent Argentine courts: "*Sociedad Comercial del Plata S.A. s/Concurso*", May 21, 2003; "*Multicanal S.A. s/Acuerdo Preventivo Extrajudicial*", September 22, 2003; "*Inversora Eléctrica de Buenos Aires S.A. s/Concurso*", October 14, 2003; "*Cablevisión S.A. s/Acuerdo Preventivo Extrajudicial*", July 6, 2004; among others.

25.    The Joint Debtors filed before the Argentine Court evidence of the consent to the Supercanal Reorganization Plan by Unsecured Creditors representing the Requisite Majorities on November 21, 2005.  As confirmed by the receivers, as described in the First Endorsement, the Supercanal Reorganization Plan was consented individually by a total of 124 Unsecured Creditors, out of a total of 190 (including the Holders) (what represented 65.2632% on account of the Headcount Basis), and by an aggregate of AR\$/\$283,905,812.71[6], out of a total aggregate of AR\$/\$411,641,115.82[7] (including the Unsecured Notes) (what represented 68.9693% on account of the Principal Majority).

26.    To the extent the process for the filing of proof of claims was completed prior to the incorporation of §45bis in the Argentine Insolvency Law, the Argentine Court admitted that the Holders consented to the Supercanal Reorganization Plan by written consent on an individual basis under the original §45[8] of the Argentine Insolvency Law.  As described above, the Debtor largely obtained the Requisite Majorities under §45 of the Argentine Insolvency Law on the individual basis calculation, without application of the new §45bis in respect of the Holders, despite the application of the latter under its then prevailing construction (on November 21, 2005) was more favorable to the calculation of the Requisite Majorities.  Accordingly, on

---

[6] Since 1992, and until repeal of the Convertibility Law (as defined below) in January 2002, the exchange rate between United States Dollars and Argentine Pesos was AR\$1 = USD1.

[7] Since 1992, and until repeal of the Convertibility Law (as defined below) in January 2002, the exchange rate between United States Dollars and Argentine Pesos was AR\$1 = USD1.

[8] Pursuant to the original § 45 "[*i*]*n order to obtain the approval of the reorganization plan, the debtor must file before the court, until the date of the expiration of the exclusivity period the reorganization proposal with the consents, evidenced by written declaration with signatures attested before a notary public, or judicial or administrative authority, in the case of the public national, provincial or municipal governments, of the absolute majority, within each and one of the classes, which represent two thirds of the principal amount to be computed within each class, dated after the filing before the court of the last reorganization plan or its last amendment*".

January 4, 2006, the Argentine Court issued the resolution acknowledging the verification of the Requisite Majorities and the existence of the Supercanal Reorganization Plan[9].

27.     On November 23, 2007, the Debtor implemented the Second Merger with effect as of December 1, 2007 and, therefore, as of such date all Joint Debtors were consolidated into the Debtor, and the Joint Debtors reorganization proceedings were also consolidated in the Foreign Proceeding.

28.     The Argentine Court endorsed the Supercanal Reorganization Plan on December 26, 2007 (the "**First Endorsement**"), which resolution was appealed by the Holders of the Secured Notes.  Upon the appeal, on October 30, 2009, the Room A of the National Court of Appeals in Commercial Matters (*Cámara Nacional de Apelaciones en lo Comercial, Sala A*) (the "**Room A of the Court of Appeals**") partially revoked the First Endorsement and remanded to the Argentine Court for implementation of certain conditions set forth by the Room A of the Court of Appeals in connection with the challenges formulated by the secured creditors, without affecting the terms of the Supercanal Reorganization Plan.

29.     Upon remand, and after the Debtor satisfied the conditions imposed by the Room A of the Court of Appeals, on March 3, 2011 the Argentine Court issued a new resolution granting a new endorsement to the Supercanal Reorganization Plan (the "**Endorsement Order**"), which was appealed by the holders of the Secured Notes.  Upon the appeal, on December 28, 2011, the Room A of the Court of Appeals ratified the Endorsement Order subject to the granting of a bank's surety bond, insurance policy or similar guarantee for USD35,000,000 in favor of the secured creditors (the "**Court of Appeals Confirmation**"), which was satisfied by the Debtor.

---

[9] Pursuant to §49 of the Argentine Insolvency Law, "*[w]ithin three (3) days after the relevant consents are submitted, the judge shall issue a resolution making known the existence of the preventive composition.*"

30.    The holders of the Secured Notes who appealed the Endorsement Order filed an extraordinary appeal to the Court of Appeals Confirmation before the Room A of the Court of Appeals, which the Court of Appeals rejected on September 20, 2012.  Therefore, the holders of the Secured Notes filed a direct appeal before the Supreme Court (the Court of last resort).

31.    On December 19, 2012, the Agents incorporated the SPV, under the denomination of "Supercablecanal S.A.", and after the implementation of the SCSA Capitalization on February 1, 2012, the TIC Capitalization on August 8, 2013, and the BTC Capitalization on March 29, 2012, on April 12, 2013, the SPV implemented an SPV Capitalization.  For purposes of the implementation of the Capitalizations, all Convertible Unsecured Claims denominated in foreign currency with foreign Unsecured Creditors (including the Unsecured Notes) were converted into Argentine Pesos at the average of the buy and sell foreign exchange for United States Dollars published by the Banco de la Nación Argentina on the Court of Appeals Confirmation date, equal to $1 = AR$4.30 (the "**Applicable Exchange Rate**").  Since then, the Class A Shares have been made available for exchange by all Unsecured Creditors, including the Holders of the Unsecured Notes.

32.    On March 10, 2015, the holders of the Secured Notes who filed the direct appeal before the Supreme Court desisted from the appeal. Therefore, the Endorsement Order became final as of the date of the Court of Appeals Confirmation (December 28, 2011).

33.    On December 4, 2015 the Court issued a resolution to the effect of declaring the conclusion of the Foreign Proceeding, notice of which was given through statutory publications in January 2016.  Such resolution became final and unappealable without objections.

34.    Upon order of the Argentine Court, on March 10, 2017, the Debtor published notices informing the availability of the Class A Shares for exchange for the Unsecured Claims

under the Supercanal Reorganization Plan in Diario La Nación, one of the widest circulation

newspapers in Argentina; and between June 8, 2017 and July 4, 2017, the Debtor served personal

notice of the tender and the availability of the Class A Shares for exchange to each of the

Unsecured Creditors' last addresses fixed in the Foreign Proceeding by means of *cédula* (official

notice served by order of a court) (including the Holders of the Unsecured Notes, at the Trustee's

fixed domicile in Argentina).

35.     On October 3, 2016 and April 28, 2017, the SPV approved additional SPV

Capitalizations in order to comply with the issuance of all Class A Shares required to comply

with the exchange under the Supercanal Reorganization Plan with respect to all Unsecured

Creditors verified and admitted as of such date.

36.     After verification by the Argentine Court of the publications described in

paragraph 34 above in connection with the diffusion of the availability of the Class A Shares for

exchange in the manner described therein, and of the compliance with all other pertinent

performances of the Debtor under the Supercanal Reorganization Plan; and after the favorable

opinion of the receivers, the Argentine Court issued the resolution declaring the Supercanal

Reorganization Plan duly complied in accordance with §59[10] of the Argentine Insolvency Law

on July 10, 2017.  Such resolution became final and unappealable without objection.

37.     As described above, the Unsecured Notes are registered in the name of Cede &

Co., as nominee of DTC, as central depositary.  Therefore, the Debtor has only access to the

Holders of the Unsecured Notes (the registered participants in DTC appearing as holders of the

Unsecured Notes in the securities position listing issued by DTC (a "**DTC Participant**")) but

---

[10] "*Fulfillment of the composition shall be declared by means of a judicial resolution issued by the judge who has taken part in the insolvency proceedings, at the debtor's request, and with prior notice sent to the overseers in charge of monitoring the fulfillment of the composition.*"

does not have access to the beneficial owners of such Unsecured Notes (the "**Beneficial Owners**") (to whom the Class A Shares must be delivered), if the positions in the Unsecured Notes are held by such DTC Participant on behalf of its clients.  To the extent that the Class A Shares are issued in nominative non-endorsable certificated form and registered in the stock ledger of the SPV and are not eligible for trading in the DTC system, they cannot be delivered automatically through the DTC system.  Rather, each Beneficial Owner must deliver or cause to be delivered its Unsecured Notes to the Trustee for exchange for the Class A Shares.

38.    Pursuant to §55 of the Argentine Insolvency Law, the endorsement of a reorganization plan causes the discharge of all Unsecured Claims, pursuant to which, the original rights of the Unsecured Creditors to receive payment under the Unsecured Claims is replaced by operation of law for the right to receive the consideration offered in the Supercanal Reorganization Plan.

39.    The Argentine Insolvency Law does not provide for a specific statute of limitations term for the tender of the consideration under a reorganization plan and, therefore, such statute of limitations is governed by the general statute of limitations rules of the Argentine Civil and Commercial Code (the "**Applicable Statute of Limitations**").  The Applicable Statute of Limitations may not be modified by convention and may be invoked in all cases (§§2533 and 2536 of the Argentine Civil and Commercial Code), and the generic statute of limitations term is five years (§2560 of the Argentine Civil and Commercial Code).

40.    In respect of the exchange of the Unsecured Claims for the Class A Shares under the Supercanal Reorganization Plan, the Applicable Statute of Limitations is computed from the date when the Class A Shares were first made available to all Unsecured Creditors.

41.     As described above, notice of the exchange and the availability of the Class A

Shares for exchange was given both by publications of notices in Argentina and the service of

personal notice to all Unsecured Creditors (including the Trustee under the Unsecured Notes) at

their domiciles fixed in the Foreign Proceeding in Argentina, and the Argentine Court declared

the Supercanal Reorganization Plan satisfied.  However, in order to facilitate the access to the

exchange by the Holders of the Unsecured Notes, the Debtor undertook the additional burden of

establishing an exchange process beyond the requirements of the Argentine Court.

42.     For such purpose the Debtor appointed The Bank of New York Mellon as

exchange agent (the "**Exchange Agent**") for the Unsecured Notes and established a process

through the DTC's Automated Tender Offer Program ("**ATOP**"), by which the Holders of the

Unsecured Notes will be able to deliver their Unsecured Notes to the Exchange Agent in order to

receive their Class A Shares pursuant to the Supercanal Reorganization Plan until September 21,

2018 (the "**DTC Exchange**").  Notice of the DTC Exchange was given to all the Holders

through a Private and Confidential Communication issued by the Debtor and delivered by the

Trustee to DTC on May 25, 2018, and which the Beneficial Owners received on or about June

1st, 2018.  Beneficial Owners wishing to deliver their Unsecured Notes must instruct its broker or

custodian, to instruct such broker's or custodian's own intermediary, to instruct the DTC

Participant, to deliver its Unsecured Notes to the Exchange Agent along with the instructions to

whom the Class A Shares must be registered and delivered.

43.     After the expiration of the DTC Exchange, the Debtor will cause the Class A

Shares to continue to be available for exchange until expiration of the Applicable Statute of

Limitations.  For such purpose, the Debtor also adopted a conservative approach and computed

the Applicable Statute of Limitations from the last day of the calendar months when the notices were served personally to the Unsecured Creditors, therefore, expiring on June 30, 2022.

## **Conclusion**

44.     Based on the foregoing, I believe that the relief being requested at the outset of this chapter 15 case is well-justified, necessary under the circumstances, in the best interest of the Debtor and its creditors and should be granted.

## **Index of Exhibits**

To the best of my knowledge, information, and belief, I certify that:

(a) the copy of the Debtor's corporate structure chart attached hereto as <u>Exhibit A</u> is a true and correct copy;

(b) the copy of the Supercanal Reorganization Plan attached hereto as <u>Exhibit B</u> is a true and correct copy of the same as entered by the Argentine Court;

(c) the copy of the Endorsement Order attached hereto as <u>Exhibit C</u> is a true and correct copy of the same as entered by the Argentine Court;

(d) the copy of the Court of Appeals Confirmation attached hereto as <u>Exhibit D</u> is a true and correct copy of the same as entered by the Argentine Court;

(e) the copy of the Court of Appeal's order rejecting an extraordinary appeal of the Court of Appeals Confirmation attached hereto as <u>Exhibit E</u> is a true and correct copy of the same as entered by the Court of Appeals;

(f) the copy of the Argentine Court's resolution declaring the conclusion of the Foreign Proceeding attached hereto as <u>Exhibit F</u> is a true and correct copy of the same as entered by the Argentine Court;

(g) the copy of the Argentine Court's resolution declaring that the Supercanal Reorganization Plan has been duly complied with attached hereto as <u>Exhibit G</u> is a true and correct copy of the same as entered by the Argentine Court;

(h) the copy of the Argentine Court's certification of accuracy of <u>Exhibit B</u> through <u>Exhibit G</u> attached hereto as <u>Exhibit H</u> is a true and correct copy; and

(i) the copy of the minutes of the board meeting appointing me as foreign representative attached hereto as <u>Exhibit I</u> is a true and correct copy of the same as adopted by the Supercanal S.A. Board of Directors.

A translation in English of each Spanish-language document is attached within the respective Exhibits.

I certify pursuant to 28 U.S.C. § 1746 under penalty of perjury under the laws of the

United States of America that the foregoing is true and correct to the best of my knowledge,

information, and belief.

Buenos Aires, Argentina
Dated: June _21_, 2018.

Eduardo Marcelo Vila
Authorized Foreign Representative of the Debtor

[*Certification of Foreign Representative*]